**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**ALEXIS A. LIEN, OSB #110569**
alexis.lien@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone: (503) 727-1000
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>$8,249.00 IN UNITED STATES CURRENCY, *in rem*,<br><br>    Defendant. | Case No. 3:19-cv-01374-BR<br><br>COMPLAINT, *in rem*, FOR FORFEITURE |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and Alexis A. Lien, Assistant United States Attorney, for its Complaint *in rem* for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to 21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

**Complaint** *in rem* **for Forfeiture**                                                                                                  Page 1

II.

Defendant, *in rem*, $8,249.00 in United States currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendant, *in rem*, $8,249.00 United States currency, represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et. seq.*, and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the Declaration of Special Agent Ryan Parton, Federal Bureau of Investigation, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of Defendant, *in rem*, $8,249.00 in United States currency, that due notice be given to all interested persons to appear and show cause why forfeiture of this Defendant, *in rem*, should not be decreed; that due proceedings be had thereon; that this Defendant be forfeited to the United States; that the Plaintiff United States of America be awarded its costs and disbursements incurred in this action.

Dated this 28th day of August 2019.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*s/ Alexis A. Lien*
ALEXIS A. LIEN

## VERIFICATION

I, RYAN PARTON, declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Federal Bureau of Investigation, and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

*s/ Ryan Parton*
RYAN PARTON
Special Agent
Federal Bureau of Investigation

## DECLARATION OF RYAN E. PARTON

I, Ryan E. Parton, do hereby declare:

## PURPOSE OF THIS DECLARATION

1.      This declaration is submitted in support of a complaint for forfeiture. The information contained in this declaration is based on an investigation conducted by Federal Bureau of Investigation Special Agent Ryan E. Parton, which will show that $8,249.00 in U.S. currency seized from Anthony Dicono at the Portland International Airport is subject to forfeiture pursuant to 21 U.S.C § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq*. Information contained in this declaration is based upon my personal observations, training, and experience, and that of other law enforcement officers. This declaration does not contain each and every fact that I know about this investigation, only those necessary to establish probable cause to believe the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## AGENT BACKGROUND AND TRAINING

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2012. As a Special Agent with the FBI, my duties and responsibilities have included conducting criminal investigations for possible violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code. I am currently assigned to the Portland Regional Organized Crime and Drug Task Force (PDX-TF). PDX-TF is a coordinated effort by local and federal law enforcement officials to reduce illegal drug trafficking and related crimes in the Portland metropolitan area, specifically those areas directly related to air

**Declaration of Ryan Parton**                                                              EXHIBIT A   PAGE 1
                                                                                                   Complaint *In Rem*
                                                                                                   FOR FORFEITURE

transportation.

3. Between July of 2012 and December of 2012, I received extensive training at the FBI Academy, Quantico, Virginia, which included topics related to the methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; the use of wiretaps; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits; the use of assets to facilitate unlawful drug trafficking activity; the laws permitting forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug trafficking offenses; and money laundering investigations. I have become familiar with the types and amounts of profits made by dealers and distributors of controlled substances, and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal drug trafficking. I have received additional formal training from the Oregon Narcotics Enforcement Association (ONEA), the International Narcotics Investigations Association (INIA), and the El Paso Intelligence Center's JETWAY Interdiction Training program, which all focused on drug and bulk cash smuggling occurring within mass transportation systems.

4. Prior to being employed with the FBI, I was employed by the City of Cheyenne, Wyoming as a Police Officer for approximately seven years. During that time, I obtained a Professional Peace Officer certification through the Wyoming Police Officer's Standards Board. To obtain this certification I was required to complete over 1000 hours of law enforcement training. This training included, but was not limited to, legal process, narcotics investigations, narcotics identification, narcotics interdiction techniques, and interview and interrogation techniques.

**Declaration of Ryan Parton**                                   EXHIBIT A   PAGE 2
                                                                 Complaint *In Rem*
                                                                 FOR FORFEITURE

5.  I have participated in numerous narcotics investigations and search warrants seeking evidence of violations of Title 21 and Title 18 of the United States Code and violations of Chapter 475 (Controlled Substances) of the Oregon Revised Statutes (ORS). These warrants covered the search of locations to include: electronic communication devices; residences of drug traffickers and their co-conspirators/associates; drug manufacturing operations; and stash houses used as storage and distribution points for controlled substances and/or drug trafficking proceeds.

## BACKGROUND ON NARCOTICS PROCEEDS TRANSPORTED THROUGH AIRPORTS

6.  I know from my training and experience that drug traffickers transporting narcotics proceeds will frequently use airports to transport proceeds to a source city in order to purchase controlled substances, including marijuana, cocaine, heroin and methamphetamine. I know from my training and experience that subjects trafficking narcotics proceeds often use airports to transport proceeds because of the speed of travel, the ability to maintain custody of the proceeds, and the low detection rate by law enforcement. I know from training and discussions with other law enforcement officers that these controlled substances and proceeds of the illegal sale of controlled substances are often found during airport interdictions.

7.  Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know Oregon is a marijuana source state for destination locations across the United States. Current Oregon state laws permitting the recreational and medical growth, purchase, and possession of marijuana provide individuals with significant quantities of marijuana, which can be illegally shipped or transported to other states where marijuana is illegal and less available in order to derive substantially increased profits.

8.  Based on my experience, training and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when drug traffickers book airline travel for the purpose of purchasing narcotics. These travel indicators are inconsistent with normal travel and would only be justified under extraordinary circumstances.

9.  I know from my training and experience that drug traffickers will often book their airline travel the same day or several days before their travel. This is often done because the availability of narcotics and narcotics proceeds changes on short notice. Drug traffickers have narrow windows to conduct drug transactions when a source of supply obtains narcotics. Otherwise the source will find another buyer.

10. I know from my training and experience that drug traffickers will book one-way travel or have short turn around flights. This is commonly done because drug traffickers are delivering narcotics proceeds to their source of supply (and do not require a lot of time at their destination) or the drug trafficker is planning on transporting the purchased narcotics by car/train back to their originating city.

11. I know from my training and experience that drug traffickers will transport their narcotics proceeds in carry-on bags or concealed within natural voids inside checked luggage. Drug traffickers know that law enforcement passenger and luggage screening is most thoroughly done when passengers are entering the airport terminal and that there is less stringent screening of checked luggage. Therefore, in my experience, the larger seizures of narcotics proceeds found in airports are typically concealed within checked baggage. Drug traffickers believe that their greatest threat for detection of narcotics proceeds within checked bags is from x-ray screening. For that reason, drug traffickers will often wrap currency in mylar to prevent detection by x-ray machines.

**Declaration of Ryan Parton**                                         EXHIBIT A   PAGE 4
                                                                      Complaint *In Rem*
                                                                      FOR FORFEITURE

12.    I know from my training and experience that, when contacted by law enforcement, drug traffickers carrying narcotics proceeds will be deceptive about the amount of currency they are carrying.  Drug traffickers usually underestimate or are evasive about the quantity of the currency they are carrying because they are aware law enforcement can seize narcotics proceeds.  Drug traffickers usually believe that if they are in possession of a lesser amount of currency that it is less likely to be seized by law enforcement.  It is common for drug traffickers carrying narcotics proceeds to change their statements regarding the amount of currency that they are carrying several times.

## SUMMARY OF INVESTIGATION

13.    On February 12, 2019, Task Force Officers (hereinafter "TFO") and Agents of the PDX-TF were conducting standard interdiction operations at Portland International Airport.  This specific interdiction operation focused on passengers who arrived on United Airlines flight 1950, which originated in Denver, Colorado and arrived in Portland, Oregon at approximately 11:25 p.m.

14.    During this operation, PDX-TF TFO Timothy Osorio and I were dressed in civilian clothing.  Multnomah County Sheriff's Office K9 Deputy Kevin Jones was also wearing civilian clothing but openly displayed his department issued "Deputy Sheriff" markings and badge.  Deputy Jones' police K9 "Blaze" also wore a vest which prominently displayed "Sheriff's K9."

15.    At approximately 1:30 p.m. Deputy Jones began contacting passengers deplaning from the United Airlines flight and asked for consent to allow K9 Blaze to "sniff" the luggage carried by the passengers.  K9 Blaze sniffed approximately 20 bags with no alerts.

16. Deputy Jones' official police report states the following:

> During the course of this particular deployment I observed K-9 Blaze sniff approximately 20 bags, I was present while Detective Osorio asked a subject for consent to sniff his bag. I deployed Blaze by presenting a bag which [was held] close to the ground. I observed K-9 Blaze sniff and then bite this particular bag which I know from previous deployments and training leads to Blazes alert. I pulled K-9 Blaze off the bag and Detective Osorio immediately walked a short distance away with the subject and began talking to the subject.

17. TFO Osorio and I contacted the person in physical control of the bag K9 Blaze alerted to. Investigators identified themselves as law enforcement and informed the passenger that investigators contacted him based on the K9 alert on his carry-on luggage. The passenger was identified as Anthony Dicono (hereinafter "Dicono").

18. A non-custodial interview of Dicono was conducted by TFO Osorio. During the interview, Dicono informed TFO Osorio that he was carrying approximately $5,000 USD and it was contained within his carry-on luggage. Dicono then stated it was closer to $10,000 USD and later stated the amount was between $8,000 USD and $10,000 USD. Dicono consented to the search of his luggage. As indicated by Dicono, TFO Osorio located a large amount of loose US currency contained in Dicono's carry-on luggage. The amount found within Dicono's luggage was $8,249 USD.

19. Often drug traffickers will report they have less than $10,000 USD because they assume international requirements to report cash valued over $10,000 USD also applies for domestic travel. Drug traffickers engaged in money smuggling activities will also provide inaccurate amounts in an attempt to limit law enforcements search of the container which the money is concealed. For example, the subject claims to be in possession of $5,000 USD, the subject hopes that once the officer searches the bag and finds the reported $5,000 USD, the officer

will then terminate the search resulting in other concealed money being overlooked. In some cases, drug traffickers engaged in these activities will provide inaccurate amounts of currency because they themselves are unaware of how much money they are transporting.

20. During the interview, Dicono was asked about his trip. Dicono stated his flight originated in Atlanta, Georgia, and had a lay-over in Denver, Colorado prior to arriving at PDX. Dicono stated that he paid approximately $500 for a round trip airfare. Dicono stated he was returning back to Atlanta on Tuesday, February 19, 2019. When asked about the nature of his visit, Dicono stated he was in Oregon to visit a friend named "Jamie." Dicono could not recall "Jamie's" last name and stated she lived somewhere in Tualatin, Oregon. Dicono further stated he was considering moving to the Portland area, and that was why he had the large amount of US currency in his bag. When asked, Dicono revealed he had not previously contacted or researched any residential apartments or homes within the Portland or the greater metropolitan area. When asked where Dicono was staying during his current visit, Dicono stated he planned to get a rental home, however had yet to secure one.

21. TFO Osorio inquired about Dicono's employment. Dicono stated he owned his own business called "Sneaker me stupid" and made approximately $72,000 USD in 2018. Per Dicono, this business was a shoe retailer. I conducted a quick Google search for the business "Sneaker me stupid" and found no results. Dicono stated his business was not a registered business and did not have a website. TFO Osorio asked Dicono if he banked at a financial institution. Dicono stated he banked at Suntrust Bank. When asked by TFO Osorio, Dicono stated he had retrieved the currency from a Suntrust Bank branch a couple days ago. Dicono was asked what Suntrust branch or location he had retrieved the currency from. Dicono could not provide that

information. Dicono was also unable to access any banking applications on his phone to validate the origin of the carried US currency.

22.     Dicono was asked if he had any communications on his cell phone, such as an email or text, between him and his employer or others that would verify or validate his story, the nature of his visit, or the source of the currency. Dicono stated he did not. TFO Osorio asked for consent to view Dicono's current texts and pictures on his cell phone. Dicono produced two separate cell phones, unlocked them, and allowed TFO Osorio to view the requested information.

23.     TFO Osorio's police report documented the following observations. The photos captured from Dicono's phone are also included below:

> I located several messages on Mr. Dicono's cell phone dated in January 2018[1] that discussed the sale of marijuana and/or marijuana products. I photographed the mentioned text messages. I then confronted Mr. Dicono with these messages. Mr. Dicono told me that he only facilitated the marijuana transactions. I also located a drug ledger in the cell phone identifying price for product of different marijuana strains. Mr. Dicono confirmed the ledger was a drug ledger.



---

[1] The report erroneously states that the text messages are dated January 2018. The text messages are actually from January 2019.

**Declaration of Ryan Parton**                                          EXHIBIT A   PAGE 8
                                                                        Complaint *In Rem*
                                                                        FOR FORFEITURE



24. At approximately 1:40 p.m. on February 12, 2019, Deputy Jones was asked to "run" (to conduct a K9 sniff solely on the seized cash in an effort to determine the presence of narcotic odor) the cash that was found in Dicono's carry-on luggage. Prior to running K9 Blaze on the target bags, I set up a "line" of bags in similar size and appearance. The bags were placed on the ground outside of gate E4. Deputy Jones used K9 Blaze to "proof" the bags, the area and a bag containing circulated U.S. Currency which was not associated to Dicono. K9 Blaze had no change of behavior during that deployment.

25. With no alerts to the blank bags, circulated U.S. Currency, or the areas where the deployment occurred, I set a "line" in the same areas. I placed the target bag, which contained Dicono's currency, the circulated U.S. Currency which was not associated to Dicono, in random spots in the "line" that would be unknown to both Deputy Jones and K9 Blaze. Deputy Jones ran

the "line-up blind," meaning that he did not know the location of the subject U.S. currency. I also stood out of Deputy Jones' field of view to avoid him "cuing" him or K9 Blaze.

26. At approximately 1:42 p.m., Deputy Jones deployed K9 Blaze on the line up. Deputy Jones recorded the results in his official police report as follows:

> I deployed Blaze on the bags and he did not alert. Special Agent Parton switched out one of the empty bags with the currency seized from S1's (Dicono) bag. I presented the bags to K-9 Blaze a second time and Blaze alerted on bag #4 which Special Agent Parton told me had the currency seized from the subject. K-9 Blaze has been presented circulated and un-circulated currency on at least 17 prior occasions during training and deployments and has never alerted.

27. Based on the totality of the circumstances, the information learned from interviewing Dicono, and the information observed within Dicono's cell phone, I believed the currency was proceeds from illegal activity and/or was used or intended to be used to facility illegal activity. The currency was administratively seized by the FBI and Dicono was issued a receipt for the seized currency.

## CONCLUSION

28. Based on the foregoing information, I have probable cause to believe, and do believe, that the $8,249 in U.S. currency seized from Anthony Dicono is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C § 801, *et. seq*.

///

///

///

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 28th day of August 2019.

*/s/ Ryan Parton*
RYAN E. PARTON
Special Agent
Federal Bureau of Investigation

**Declaration of Ryan Parton**　　　　　　　　　　EXHIBIT A   PAGE 11
　　　　　　　　　　　　　　　　　　　　　　　　Complaint *In Rem*
　　　　　　　　　　　　　　　　　　　　　　　　FOR FORFEITURE

≋JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                                           and One Box for Defendant)

|                                      | PTF | DEF |                                                                    | PTF | DEF |
|--------------------------------------|-----|-----|--------------------------------------------------------------------|-----|-----|
| Citizen of This State                | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State        | ☐ 4 | ☐ 4 |
| Citizen of Another State             | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State    | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                                 | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
|  | **PERSONAL INJURY** | **PERSONAL INJURY** |  |  |  |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability |  | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract |  |  | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment |  | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  |  |
|  |  | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE _____      SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____